

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

THE DOE RUN RESOURCES
CORPORATION,

      Respondent,

vs.

AMERICAN GUARANTEE &
LIABILITY INSURANCE and
LEXINGTON INSURANCE COMPANY,

      Defendants,

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

      Appellant.

No. ED103026

Appeal from the Circuit Court of
St. Louis County
10SL-CC01716

Honorable Thomas J. Prebil

Filed: September 27, 2016

### OPINION

This is an insurance coverage case. St. Paul Fire and Marine Insurance Company ("St. Paul") appeals the trial court's judgment which found that St. Paul has the duty to defend the Doe Run Resources Corporation ("Doe Run") in the toxic-tort lawsuits that underlie this litigation, and which ordered St. Paul to reimburse Doe Run for its defense costs and to pay prejudgment interest on those damages. St. Paul contends that the trial court erred (1) because the "pollution exclusion" in Doe Run's Commercial General Liability policy ("CGL policy") bars coverage for the bodily injuries alleged in the underlying lawsuits; (2) because under the circumstances Doe Run's CGL

policy constitutes "excess insurance" and another insurer has the duty to defend Doe Run; (3) because even if St. Paul had the duty to defend, St. Paul still should not be obligated to reimburse Doe Run for its defense costs incurred prior to March 16, 2012, since according to St. Paul, Doe Run did not until then demand coverage in the underlying lawsuits under the CGL policy; and (4) because the award to Doe Run of prejudgment interest on the damages awarded was improper, since the damages were not liquidated until just before the trial. We affirm the judgment of the trial court as to Points I and II. However, as to Points III and IV, we reverse and remand to the trial court for further proceedings consistent with this opinion.

## Factual and Procedural Background

Doe Run is a Missouri corporation that mines, mills, smelts, and fabricates lead ore and other metallic ores to produce lead and lead concentrates, and other metals and metal concentrates. Although Doe Run has operated primarily in Missouri since the mid-nineteenth century, this case and the toxic-tort lawsuits that underlie it concern Doe Run's mining and other operations at its metallurgical industrial complex in La Oroya, Peru. The La Oroya complex became the subject of Missouri toxic-tort litigation in October 2007, when Doe Run and others were sued in a class action lawsuit filed on behalf of Peruvian citizens living in the vicinity of the complex. Like the underlying lawsuits here, the 2007 lawsuit alleged that the plaintiffs suffered bodily harm as a result of toxic releases from the complex. On August 6, 2008, however, the 2007 lawsuit was voluntarily dismissed.

The next day, Doe Run and others were sued in two of the underlying lawsuits here— which eventually have come to number more than 20—filed on behalf of minor plaintiffs living in the vicinity of the La Oroya complex. Litigation of these suits is ongoing. Each of the lawsuits presents the same set of allegations against Doe Run and six of its officers, including causes of

2

action for negligence, civil conspiracy, absolute or strict liability, and contribution, for the harmful release of toxic substances from the La Oroya complex.

In April 2010, Doe Run filed this insurance coverage case against four insurance companies, at the time not including St. Paul, seeking reimbursement for defense costs that Doe Run had incurred and has continued to incur in defense of the underlying ongoing La Oroya complex lawsuits. The insurance companies sued by Doe Run included National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"), which issued Doe Run a Directors and Officers ("D&O") liability policy, and American Guarantee & Liability Insurance Company ("AGLIC"), which issued Doe Run a global general commercial liability policy covering a period earlier than that of the St. Paul policy. Like St. Paul here, National Union contended that it was not obligated to reimburse Doe Run's defense costs because coverage for the underlying lawsuits is excluded by the pollution exclusion provision in its policy. The trial court rejected National Union's argument and found in its judgment entered on November 7, 2011, that National Union had a duty to defend Doe Run, with whom the insurer eventually settled, making a lump-sum payment for past defense costs and agreeing to pay a portion of such costs on an ongoing basis. Doe Run also settled with AGLIC, which made a lump-sum payment for past defense costs. The claims against the other two insurers were dismissed.

St. Paul was added to this case along with AGLIC, in Doe Run's amended petition for declaratory relief, breach of contract, and unreasonable refusal to pay, filed on May 17, 2012. Doe Run asserted (1) that St. Paul has the duty to defend it in the underlying lawsuits; (2) that St. Paul's breach of its duty to defend Doe Run has resulted in damages to Doe Run; and (3) that St. Paul has unreasonably and in bad faith refused to pay the losses for which it insures Doe Run, and thus must

3

pay an additional amount in damages pursuant to § 375.420[1] sanctioning vexatious refusals to pay. Following a period of discovery, both parties moved for summary judgment.

St. Paul's first motion for summary judgment asserted that it is not obligated to defend Doe Run in the underlying lawsuits because coverage is excluded by the pollution exclusion in the CGL policy. Doe Run filed a cross-motion for partial summary judgment, arguing that St. Paul has a duty to defend it in the underlying lawsuits because the pollution exclusion is ambiguous and thus must be construed in favor of coverage for the insured, and because the "other insurance" provision in the CGL policy did not exclude coverage. Because Doe Run's cross-motion addressed both the pollution exclusion and "other insurance" provisions, St. Paul filed a second motion for summary judgment addressing the "other insurance" provision and asserting that under the terms of the CGL policy, St. Paul has no duty to defend Doe Run here because in these circumstances the CGL policy constitutes "excess insurance" and National Union has the duty to defend Doe Run.

The trial court denied St. Paul's motions and granted Doe Run's, finding that St. Paul has the duty to defend Doe Run in the underlying lawsuits. Trial on the extent of St. Paul's obligation to reimburse Doe Run for past defense costs was scheduled for December 8, 2014. On November 12, 2014, St. Paul filed a motion in limine seeking to preclude Doe Run from recovering defense costs incurred before it demanded coverage from St. Paul, which St. Paul alleged Doe Run failed to do until March 16, 2012.

At the outset of the trial on damages, the court heard argument on St. Paul's motion in limine and took it under advisement. The trial lasted two days, during which the parties presented evidence in support of their positions on the amount of past defense costs owed by St. Paul. At the close of Doe Run's case, St. Paul filed a motion for judgment pursuant to Missouri Supreme

---

[1] All statutory references herein are to RSMo 2012.

4

Court Rule 73.01(b), arguing that even if St. Paul were found to have the duty to defend, St. Paul still should not be obligated to reimburse Doe Run for its defense costs incurred prior to March 16, 2012, since according to St. Paul, Doe Run did not until then demand coverage in the underlying lawsuits under the CGL policy.

On February 18, 2015, the trial court rejected St. Paul's arguments in the motion in limine and motion for judgment and ordered that St. Paul reimburse Doe Run for all its unrecovered fees and costs incurred in defense of the underlying lawsuits. While the court did find that St. Paul's refusal to pay was not vexatious and recalcitrant—and accordingly dismissed that part of the case with prejudice—pursuant to § 408.020, the court awarded Doe Run prejudgment interest on all damages from the date incurred.

Then, on April 23, 2015, the trial court entered its final judgment in this case, restating the integral findings of its prior judgments as to St. Paul's liability and providing the final calculations of damages owed, including prejudgment interest. The trial court found St. Paul liable to Doe Run for a total of $2,108,535.44 in damages made up of three sub-totals: $1,676,147.24 in defense costs presented at trial; $129,624.11 in additional defense invoices not presented at trial; and $302,764.09 in prejudgment interest on those defense costs. St. Paul now appeals the final judgment of the trial court as to whether it has a duty to defend Doe Run, and as to whether it owes any damages in this case—and if so, how much.

### Standards of Review

We review de novo the trial court's ruling on cross-motions for summary judgment. *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 826 (Mo.banc 2014). Summary judgment is appropriate if no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d

5

371, 376 (Mo.banc 1993). We review the record in the light most favorable to the party against whom judgment was entered. *Id.*

Like the propriety of summary judgment, the interpretation of an insurance policy is a question of law that we review de novo. *Dutton v. Am. Fam. Mut. Ins. Co.*, 454 S.W.3d 319, 321 (Mo.banc 2015). The rules of contract construction apply to the construction of insurance policies. *Naeger v. Farmers Ins. Co., Inc.*, 436 S.W.3d 654, 659 (Mo.App.E.D. 2014). Where a policy is open to the reasonable interpretation that it provides coverage for a particular loss, we will find that it does so; in construing the terms of an insurance policy, we apply the meaning an ordinary person of average understanding would attach if purchasing the policy and resolve in favor of the insured any ambiguities about whether there is coverage under the policy. *Dutton*, 454 S.W.3d at 322. An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. *Naeger*, 436 S.W.3d at 659 (citing *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo.banc 2007)). Language is ambiguous if it is reasonably open to different constructions. *Id.* (citing *Seeck*, 212 S.W.3d at 132).

The words and phrases in a policy must be interpreted in the context of the insurance contract as a whole and should not be considered in isolation. *Id.* (citing *Long v. Shelter Ins. Cos.*, 351 S.W.3d 692, 696 (Mo.App.W.D. 2011)). As part of the insurance contract we consider not only the form policy, but also any summaries or declarations, definitions, or endorsements. *See Christensen v. Farmers Ins. Co. Inc.*, 307 S.W.3d 654, 658 (Mo.App.E.D. 2010).

Exclusionary clauses are strictly construed against the drafter, who also bears the burden of showing the exclusion applies. *Id.* (citing *Burns v. Smith*, 303 S.W.3d 505, 509–10 (Mo.banc 2010)). This rule, often referred to as the doctrine of *contra proferentem*, is applied "more rigorously in insurance contracts than in other contracts" in Missouri. *Burns*, 303 S.W.3d at 509-

6

510 (citing *Mansion Hills Condominium Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 637 (Mo.App.E.D. 2001)).

We also review de novo the trial court's award of damages and prejudgment interest to Doe Run, because the facts are not in dispute and the only issues are matters of law. *See Smith v. State*, 152 S.W.3d 275, 277 (Mo.banc 2005) (citing *ITT Commercial*, 854 S.W.2d at 376). Although *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976), governs our review of this judge-tried case, we review de novo issues that are "strictly a question of law." *Jennings v. Atkinson*, 456 S.W.3d 461, 464 (Mo.App.W.D. 2014).

### Point I: The "Pollution Exclusion"

In Point I, St. Paul contends that it has no duty to defend Doe Run because the "pollution exclusion" in Doe Run's CGL policy bars coverage for the bodily injuries alleged in the underlying lawsuits. We disagree because the policy is ambiguous as to whether the pollution exclusion excuses St. Paul from the duty to defend Doe Run, and thus the terms of the policy must be construed in favor of coverage for the insured.

In this lawsuit, Doe Run seeks only to enforce the duty to defend, which is broader than the duty to indemnify. *Allen v. Continental W. Ins. Co.*, 436 S.W.3d 548, 552 (Mo.banc 2014). The insurer's duty to defend arises when there is at least a *potential* or *possible* liability to pay based on the facts at the outset of the case. *Id.*; *see also McCormack Baron Mgmt. Serv., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo.banc 1990) ("The duty to defend . . . is not dependent on the probable liability to pay based on the facts ascertained through trial."). In determining whether an insurer has a duty to defend, the Court first compares the policy language with the allegations in the petition from each underlying lawsuit. *Allen*, 436 S.W.3d at 552. If the underlying petition alleges facts that give rise to a claim potentially covered by the policy, the

7

insurer has a duty to defend. *Id.* Beyond the facts alleged in the plaintiff's petition, the insurer also has a duty to defend if facts that are known to the insurer or that are reasonably apparent to the insurer at the commencement of the suit establish a potential for coverage. *Id.* To extricate itself from a duty to defend the insured, the insurer must prove that there is *no possibility of coverage. Renco Group, Inc. v. Certain Underwriters at Lloyd's, London*, 362 S.W.3d 472, 479 (Mo.App.E.D. 2012) (citing *McCormack*, 989 S.W.2d at 170)); *see also Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 394 (Mo.App.E.D. 2007) (noting that the insurer "has the burden of clearly and unambiguously expressing its intent to exclude" coverage, and of "proving that any exclusion upon which it relies is applicable").

Doe Run's CGL policy provides coverage for "bodily injury and property damage liability," "personal injury liability," "advertising injury liability," and "medical expenses . . . incurred for bodily injury." The policy contains a "pollution exclusion" that in pertinent part excludes coverage for "injury or damage or medical expenses that result from pollution . . . from any: protected person's premises; waste site; or protected person's work site." The policy defines "pollution" as "any actual, alleged, or threatened discharge, dispersal, escape, migration, release, or seepage of any pollutant." "Pollutant" is defined as "any solid, liquid, gaseous, or thermal irritant or contaminant, including: smoke, vapors, soot, fumes; acids, alkalis, chemicals; and waste."

St. Paul argues that the allegations in the underlying lawsuits fall entirely and unambiguously within the language of the pollution exclusion. The lawsuits "seek recovery from [Doe Run] for injuries, damages and losses suffered by . . . minor plaintiff[s]" as a result specifically of "exposure to the *release* [from Doe Run's La Oroya, Peru complex] of lead and other toxic substances . . . including but not limited to lead, arsenic, cadmium, and sulfur dioxide,

8

into the air and water and onto the properties on which the minor plaintiffs have in the past and/or continue to reside, use and visit." (emphasis added).

While St. Paul's argument might be well taken if we were to consider only particular parts of Doe Run's CGL policy—such as the pollution exclusion—and to ignore others, we are bound to construe the policy as a whole, *see, e.g., Naeger, supra*, and we find that other portions of the policy, in particular the policy's "Estimated Premium Summary," render ambiguous whether coverage should be excluded in this case based on the policy's pollution exclusion. The premium summary provides that the basis St. Paul uses to compute Doe Run's premium is "ore," and assigns the rating classification "mining, smelting, recycling and fabrication of base metals" to Doe Run's operations at its La Oroya complex. The summary lists the "estimated exposure"—defined as the "amount of premium basis developed for each rating classification"—as "266,007 tons" of ore.

Reading such provisions, the ordinary person of average understanding purchasing the policy might reasonably believe that it was being insured as a miner, smelter, recycler, and fabricator of base metals, and that an insurance policy covering bodily injury liability, among other things, arising from such operations could hardly base its premium rate on estimated exposure from the mining, smelting, recycling, and fabrication specifically of *lead ore* and other metals—a process that inevitably produces toxic byproducts—without covering injuries resulting at least in part from exposure to the toxic elements of that process. Indeed, it is entirely sensible to conclude, as the ordinary person of average understanding might after reading the policy's "Estimated Premium Summary," that the more lead ore Doe Run mines from the earth, the higher its risk of exposure to bodily injury liability—and, as a direct result, the higher the "estimated exposure" listed by St. Paul in the policy, and the higher the premium Doe Run must pay. To the reasonable reader of this policy, then, that Doe Run's premium rate for this policy is tied directly to the amount

9

of ore it mines, smelts, recycles, and fabricates may suggest that increasing the output of this process—and thus also the inevitable production of its toxic byproducts—increases the risk of covered bodily injury liability *specifically because* such increases in output heighten the risk of *harmful exposures to the toxins resulting from the process*, including such exposures as those alleged in the lawsuits underlying this litigation.

As a result, the ordinary person of average understanding purchasing Doe Run's CGL policy with St. Paul might reasonably conclude based on the language of the policy that it provides coverage for the underlying lawsuits. Because such a person might reasonably perceive a conflict between the terms of the policy's pollution exclusion and its premium summary, *cf. Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132 (Mo.banc 2009) (finding automobile insurance policy ambiguous as to whether it was "stackable" because of conflicts between the provisions of the policy's declarations page and those of other sections), the policy is ambiguous on this issue, and thus we must construe the policy terms in favor of coverage for the insured.[2] Point I is denied.

**Point II: The "Other Insurance" Provision**

In Point II, St. Paul asserts that the trial court erred by denying St. Paul's motion for summary judgment that argued St. Paul has no duty to defend Doe Run because under the circumstances Doe Run's CGL policy constitutes "excess insurance" and another insurer has the

---

[2] Moreover, in interpreting contracts, including insurance contracts, we must apply the rule that when there is a conflict between the contract's typewritten and preprinted language, the typewritten will prevail as the true intent of the parties. *Mews v. Charlie Chan Pub. Co.*, 884 S.W.2d 109, 111 (Mo.App.E.D. 1994) (citing *House of Lloyd v. Dir. of Revenue*, 824 S.W.2d 914, 923 (Mo.banc 1992), overruled on other grounds by *Sipco, Inc. v. Dir. of Revenue*, 875 S.W.2d 539 (Mo.banc 1994)). Accordingly, since we have found that a reasonable person might perceive a conflict between the typewritten information in the CGL policy's premium summary—e.g., the rating classification, premium basis, and estimated exposure—and the preprinted language in its pollution exclusion as to whether the policy provides coverage in the underlying lawsuits, we are bound to conclude that the typewritten language must prevail.

duty to defend Doe Run. We disagree because even if there was a dispute of material fact as to whether the policy constitutes "excess insurance," there is no question St. Paul has the duty to defend Doe Run in the lawsuits underlying this litigation because no other insurer has been found to have the duty to defend Doe Run with respect to all the same parts of those lawsuits for which the trial court here found St. Paul has the duty to defend.

St. Paul claims that it has no duty to defend Doe Run because coverage here is excluded under the "other insurance" provision in the CGL policy, which reads in pertinent part:

> **Other Insurance** This agreement is primary insurance. However, if there's any valid and collectible other insurance for injury or damage covered by this agreement, we'll apply this agreement in connection with that other insurance in accordance with the rest of this section. Other insurance means insurance, or the funding of losses, that's provided by or through: another insurance company . . . .
>
> **Primary or excess other insurance.** When there's primary other insurance, we'll share with that other insurance any damages for injury or damage covered by this agreement. . . . However, we'll apply this agreement as excess insurance over . . . any other similar coverage that is issued in a country within the coverage territory. . . . We explain how we'll apply this agreement as excess insurance in the When this agreement is excess insurance section. . . .
>
> **When this agreement is excess insurance.** When this agreement is excess insurance, we won't have a duty to defend the protected person against the part or parts of any claim or suit for which any provider of other insurance has the duty to defend that protected person.

According to St. Paul, Doe Run's CGL policy applies as "excess insurance" over primary insurance issued by Rimac, a Peruvian insurer, because the Rimac policy constitutes "other similar coverage that is issued in a country within the coverage territory." Further, St. Paul reasons, because it is an excess insurer in these circumstances and another insurer, National Union, has been found to have the duty to defend Doe Run in the underlying lawsuits, St. Paul does not have the duty to defend.

11

Addressing this argument, the trial court denied St. Paul's related motion for summary judgment because the court found that there remained "factual disputes" about whether Doe Run's CGL policy is excess insurance here—whether the Rimac policy constituted "valid and collectible" other insurance, and whether it provided "similar coverage" to the St. Paul policy. Regardless of whether the policy is excess insurance, however, we conclude as the trial court did that St. Paul still has the duty to defend Doe Run in the underlying lawsuits because, under the strict terms of the CGL policy, National Union's duty to defend does not excuse St. Paul from providing coverage.

Indeed, as quoted above, even though the CGL policy provides that St. Paul will be excused from the duty to defend when it is an excess insurer and another insurer has the duty to defend Doe Run, the policy *only* excuses St. Paul from providing coverage for the specific *"part or parts* of any claim or suit for which any provider of other insurance has the duty to defend." (emphasis added). Thus, because the National Union policy is a D&O policy, providing coverage to Doe Run *not* for its *own* wrongful acts resulting in bodily injury, but for its indemnification obligations to its *officers and directors* who have caused harm, it does not cover all the same parts of the underlying lawsuits for which the trial court found St. Paul has the duty to defend, and thus the court did not err in concluding that St. Paul is not excused from the duty to defend here. Several counts in each of the underlying lawsuits allege harms caused by particular officers of Doe Run, while others allege harms inflicted by Doe Run itself. National Union has the duty to defend with respect to the counts naming officers, but certainly does not have the duty to defend with respect to the counts naming Doe Run alone. As the trial court properly found, with respect to those counts St. Paul has failed to shoulder its burden of proving that the alleged "other insurance" exclusion

12

eliminates any possibility of coverage and ensures that St. Paul has no duty to defend. Point II is denied.

**Point III: Reimbursement of Defense Costs Incurred Prior to Demand for Coverage**

In Point III, St. Paul claims that the trial court erred by denying St. Paul's motion for judgment that argued that even if St. Paul were found to have the duty to defend, St. Paul still should not be obligated to reimburse Doe Run for its defense costs incurred prior to March 16, 2012, since according to St. Paul, Doe Run did not until then demand coverage in the underlying lawsuits under the CGL policy. We agree and reverse and remand for findings consistent with our conclusions in this section.

This Court held in *Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314, 318 (Mo.App.E.D. 1998), that an indemnitor is *not* obligated to pay defense costs that an indemnitee incurs prior to its first demand for indemnity, since prior to any such demand the indemnitor lacks notice that it will be responsible for fees, and has no opportunity to defend the indemnitee. This Court ruled that where underlying litigation was initiated in March 1988 and the indemnitee did not claim indemnification from the indemnitor until November 1990, the indemnitee "failed" to fulfill its "duty to act reasonably to refrain from compromising [the indemnitor's] rights by giving notice of the need to defend the lawsuit," and thus the trial court in *Monsanto* erred in awarding the indemnitee attorney's fees incurred prior to its demand for indemnification. *Id.*

The *Monsanto* case was cited by a Missouri federal court construing Missouri law in *Cincinnati Ins. Co. v. Mo. Highways & Transport. Comm.*, 2014 WL 7330980 (W.D.Mo. 2014), which held that under the laws of this state, an "insurer has no duty to pay for fees incurred prior to the insured's demand for coverage." *Id.* at *1. In addition to the principle from *Monsanto*, the *Cincinnati* court relied on the unauthorized payments provision in the insurance policy at issue in

13

that case, which required that "[the insured] notify [the insurer] of any pending suit prior to assuming costs for which [the insurer] would be liable." *Id.* This provision closely mirrors provisions found in Doe Run's CGL policy, which requires that Doe Run, "[a]s soon as possible after receiving them, mail, deliver, or otherwise give to [St. Paul] a copy of . . . all legal documents relating to any suit brought . . . against [Doe Run] or any other person or organization protected under [the] policy," and that Doe Run "[n]ot assume any financial obligation or pay out any money . . . without [St. Paul's] consent."

In light of these policy provisions and legal principles, we find that St. Paul has no duty to pay for Doe Run's fees incurred prior to its demand for coverage in the particular lawsuits underlying this litigation. On this matter it appears that we agree with the trial court, which determined the date from which St. Paul must reimburse Doe Run for its defense costs by noting several dates by which, in the court's view, Doe Run had "provided notice" of the need to defend in the underlying lawsuits to—i.e., "requested coverage" in them from—St. Paul.

However, we disagree with the trial court's specific findings that (1) Doe Run provided notice of the need to defend in the underlying lawsuits as early as 2007, when Doe Run informed St. Paul of the lawsuit filed against it that year that was similar to those underlying this litigation, but that was voluntarily dismissed before any of those other lawsuits were filed, and that (2) Doe Run's letter of November 1, 2010, to Zurich American Insurance Company ("Zurich"), on which the "St. Paul Travelers Companies" in St. Paul, Minnesota, were copied as an overlying insurer— which letter, we note, simply "summarize[ed] the status of various actions" against Doe Run, including the underlying lawsuits here, "to keep relevant overlying insurers apprised for their files"—also constituted a demand by Doe Run for St. Paul to provide coverage in the underlying lawsuits under the CGL policy addressed in this case.

14

With regard to the notice St. Paul received in 2007 from Doe Run of the separate lawsuit dismissed before any of the underlying lawsuits here were filed, we find that such notice did not double as notice of the need to defend in the underlying lawsuits. Not only had those lawsuits not yet even been filed, but also, as noted above, Doe Run's CGL policy clearly requires that the insured provide St. Paul with a copy of *any* lawsuit filed against it—not just the first in any series of similar or related lawsuits filed against it. And as to the November 2010 letter to Zurich on which St. Paul Travelers Companies in St. Paul, Minnesota, were copied as an *overlying* insurer, we find it inconceivable that such constituted a *demand for coverage* in the underlying lawsuits under the CGL policy, which Doe Run claims—with support in the record—is *primary* insurance. The letter did not identify the CGL policy or state that its purpose was to demand coverage under that policy for the underlying lawsuits here. Further, counsel for Doe Run admitted on the record that Doe Run was "not in this letter asking for [St. Paul] to start providing a defense," and that statement is borne out by the evidence in the record of how Doe Run took different actions and used critically different language when it actually demanded coverage in 2007 for the dismissed lawsuit, and on March 16, 2012, for the underlying lawsuits here.[3]

---

[3] Both demands were accomplished by letter or email sent not to the St. Paul Travelers Companies' offices in St. Paul, Minnesota, as the 2010 letter was, but to St. Paul's offices in Hartford, Connecticut, with the 2012 demand sent also to St. Paul's offices in Troy, Michigan. In the 2012 demand, Doe Run proclaimed that "developments in Doe Run's coverage litigation for the [underlying lawsuits here] against other insurers leave no doubt that St. Paul has a defense coverage obligation, and must pay Doe Run for any unreimbursed defense costs." Unlike the 2010 letter, the 2012 demand contains a clear "request[] that St. Paul promptly acknowledge and provide defense coverage for the [underlying lawsuits]." Likewise, the 2007 demand—issued through a claim consultant—contained language stating, "Please accept the attached [copy of the 2007 lawsuit filed against Doe Run] as formal notice of claim. This matter is reported under any and all applicable policies whether or not cited." Days later, the consultant speaking for Doe Run complied with St. Paul's request for Doe Run to name the specific policies implicated by the claim, asking in a second email that St. Paul "[p]lease accept" the correspondence "as formal notice for Doe Run's foreign GL policies with respect to the [2007 lawsuit]."

15

Accordingly, we find that the trial court erred in determining that St. Paul had notice of a claim for coverage in the underlying lawsuits prior to March 16, 2012, the next earliest date Doe Run alleges—and the date that we conclude the record actually bears out—that Doe Run demanded such coverage. Doe Run nevertheless argues, as the trial court asserted, that "[e]ven had Doe Run failed to comply with purported tender obligations prior to March 16, 2012 . . . St. Paul can disallow defense costs only if it proves actual and substantial prejudice," but we disagree because the cases cited by Doe Run and the trial court for this principle in fact do not stand for it, but instead stand for an entirely separate rule that in cases where an insurer disclaims *all* coverage because the insured has allegedly breached a "late notice" or "cooperation" clause, the insurer must establish prejudice to avoid coverage on those grounds. *See Weaver v. State Farm Mut. Auto. Ins. Co.*, 936 S.W.2d 818, 821 (Mo.banc 1997) (holding that insurer must establish prejudice to avoid coverage on late notice grounds); *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7, 11 (Mo.banc 1995) (holding that insurer must show prejudice to avoid coverage on late notice grounds because "the denial of coverage for failing to comply with the notification requirement amounts to a forfeiture"); *Hendrix v. Jones*, 580 S.W.2d 740, 744 (Mo.banc 1979) (holding that insurer must establish prejudice to avoid coverage on grounds of breach of cooperation clause). Here, St. Paul has disclaimed coverage of only a portion of Doe Run's defense costs, and denying Doe Run coverage of such costs in the absence of prejudice here would not amount to a "forfeiture" of Doe Run's CGL policy coverage from St. Paul in any of the underlying lawsuits. Thus, St. Paul need not show prejudice. Point III is granted.

### Point IV: Prejudgment Interest

In Point IV, St. Paul argues that the trial court erred by awarding Doe Run prejudgment interest on the damages awarded even though, according to St. Paul, the damages were not

16

liquidated until just before the trial. We agree that the trial court erred in awarding prejudgment interest on the damages awarded from the date they were incurred, but we disagree that the damages were not liquidated until just before trial and reverse and remand for findings of the date each particular invoice or other record of the defense costs Doe Run seeks from St. Paul was received by St. Paul, which date we consider to be the date of liquidation of the damages reported in each record—the date from which that portion of the prejudgment interest owed has accrued.

Awards of prejudgment interest in Missouri are governed by § 408.020, which mandates that "[c]reditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts." The purpose of the statute is to fully compensate plaintiffs by accounting for the time-value of money. *See Schmidt v. Morival Farms*, 240 S.W.2d 952, 961 (Mo.banc 1951) (prejudgment interest "is the measure of damages for failure to pay money when payment is due"). Generally, prejudgment interest is not allowable upon an unliquidated claim because where the person liable does not know the amount he owes, he should not be considered in default because of failure to pay. *Investors Title Co. v. Chicago Title Ins. Co.*, 983 S.W.2d 533, 538 (Mo.App.E.D. 1998) (citing *Scullin Steel Co. v. Paccar, Inc.*, 708 S.W.2d 756, 766 (Mo.App.E.D. 1986)). In order to be liquidated so as to bear interest, a claim must be fixed and determined or readily determinable— i.e., ascertainable by computation or by a recognized standard. *Id.* (citing *Scullin Steel*, 708 S.W.2d at 766). Exact calculation, however, is not necessary for a claim to be liquidated, since to hold otherwise would allow an insurer to accrue pecuniary benefit unfairly by the simple expedient of producing conflicting estimates of value or liability. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo.App.W.D. 2008); *see also Weinberg v. Safeco Ins. Co. of Ill.*, 913 S.W.2d 59, 61

17

(Mo.App.E.D. 1995) (holding that exact calculation is not required also because "[a] court may consider equitable principles of fairness and justice when awarding prejudgment interest").

The trial court in this case did not in its judgment explicitly address whether or when Doe Run's damages were liquidated such that St. Paul could know the amount it owed and be found in default for failure to pay. In finding that Doe Run was entitled to receive prejudgment interest on all its damages from the date each part of them was incurred, the court did no more than *imply* that such date was the proper one for determining the moment of liquidation of each part of the damages. The court did not directly answer St. Paul's multiple arguments regarding the liquidation of Doe Run's damages but instead cited, in support of its award of prejudgment interest, this Court's opinion in *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London*, 400 S.W.3d 463, 477 (Mo.App.E.D. 2013)—specifically, this Court's statement therein that "[t]he fact that [the insurer in that case] presented several coverage defenses and disputed some of the costs [was] of no consequence" because "Missouri courts have allowed prejudgment interest for insurance claims where the parties did not agree to the amount due under the policy."

By focusing on this point of law, undisputed by St. Paul, and declining to expressly address St. Paul's actual arguments about liquidation, we find that under the circumstances of this case the trial court failed to properly apply the controlling principles of Missouri law laid out above. In particular, the court failed to adhere to—or find applicable any exception to—the general rule in Missouri case law that prejudgment interest is not allowable upon an unliquidated claim because where the person liable does not know the amount he owes, he should not be considered in default because of failure to pay. *See, e.g., Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314, 318 (Mo.App.E.D. 1998) ("[P]re-judgment interest is not owed prior to March 1993, because Monsanto failed to make Gould aware of the definite amount owed prior to March 1993.");

18

*Transamerica Ins. Co. v. Penn Nat'l Ins. Cos.*, 908 S.W.2d 173, 177 n.6 (Mo.App.E.D. 1995) (holding that prejudgment interest was not owed when "[n]either the insurance policies nor the pleadings were definite as to [the amount of the damages] and there was no evidence that defendant was aware of the amount owed until just prior to trial"). As a result, the trial court erroneously ordered St. Paul to pay prejudgment interest on Doe Run's damages from dates that occurred significantly before St. Paul actually learned of the specific amounts of damages at issue in this case.

At the earliest, St. Paul learned of specific damage amounts when, on December 6, 2012, it first began receiving from Doe Run copies of defense invoices and other records of defense costs. Thus, St. Paul cannot be held to owe prejudgment interest accruing from any date prior to December 6, 2012. But in light of Doe Run's submission of invoices and records to St. Paul years before trial in 2014, we must also reject St. Paul's contention that it owes Doe Run no prejudgment interest at all because Doe Run waited until less than two weeks before trial to submit a final accounting of the damages owed crediting payments received from other insurers. Even though the defense invoices sent to St. Paul before the final accounting did not reach an exact calculation of damages owed by crediting payments received from other insurers, the records clearly put St. Paul on notice of the "readily determinable" or "ascertainable" defense costs[4] for which it was potentially liable pending the judgment of the trial court regarding St. Paul's duty to defend. Accordingly, we find that each portion of the damages communicated in the forwarded invoices

---

[4] All St. Paul had to do to determine the amount of damages owed was to perform a simple computation: subtract the payments credited to other insurers from the figures in the defense invoices.

19

was liquidated when record of it was sent to St. Paul.[5] Point IV is granted in part and denied in part.

## Conclusion

For the reasons stated above, we affirm the judgment of the trial court as to Points I and II. As to Points III and IV, we reverse and remand to the trial court for further proceedings consistent with this opinion.

James M. Dowd, Judge

Robert M. Clayton III, P.J., and
Lawrence E. Mooney, J., concur.

---

[5] Also militating in favor of this conclusion is the fact that, as Doe Run points out, it was just St. Paul's good fortune that other insurers paid some of the defense costs and relieved St. Paul of the burden of paying the full value of each and every invoice sent to it. Consequently, to allow St. Paul to escape from any liability for prejudgment interest here would flout equitable principles of fairness and justice, in that Doe Run would be punished for seeking coverage from other insurers; Doe Run would lose the time-value of much of the money it spent on defense costs, solely because it sought to enforce the provisions of other insurance policies for which it must also pay substantial premiums. We will not permit such an unfair and inequitable result to obtain.